**IN THE UNITED STATES DISTRICT COURT**
**OF THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **BROOKE WHORLEY,** | ) |
| **MICHAEL SULLIVAN,** | ) |
| **GALE JONES,** | ) |
| **ALONZO WILLIAMS,** | ) |
| **DA'VON WALKER,** | ) |
| **DWIGHT HORTON,** | ) |
| **FRANK FAIRCHILD** | ) |
| **CANDACE BLANKENSHIP,** | ) |
| **BRENDA VAN EMMENIS,** | ) |
| **OLIVIA IVASHIN,** | ) |
| **ENNIS STEWART,** | ) |
| **LARTAIJA BANKS,** | ) |
| **MATTHEW MOSHER,** | ) |
| **BRUCE HARRIS JR.,** | ) |
| **JOHNATHAN MCMILLAN,** | ) |
| **MILTON WILLIAMS, SR.,** | ) |
| **TIMOTHY BRUMMETT,** | ) |
| **ANTHONY VICKS,** | ) |
| **WARREN BROOKS,** | ) |
| **JESSE DAVENPORT,** | ) |
| **WARREN MEDLEY-GREEN** | ) |
| **LAROG TROWELL,** | ) |
| **BENJAMEN FYFE,** | ) |
| **ANTONIO PERRYELL,** | ) |
| **DONNIE OFFENBACKER,** | ) |
| **FELIPE FRANCO, and** | ) |
| **COURTNEY STROBLE;** | ) |
| | ) **Case No. 3:20-cv-255** |
| *Plaintiffs* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **RALPH S. NORTHAM,** | ) |
| **BRIAN J. MORAN,** | ) |
| **HAROLD CLARKE,** | ) |
| **DONALD WILMOUTH,** | ) |
| **RICK WHITE,** | ) |
| **THOMAS MEYER,** | ) |
| **TIKKI HICKS,** | ) |
| **RODNEY YOUNCE,** | ) |
| **TRACY RAY,** | ) |
| **ERIC ALDRIDGE,** | ) |

**DANA RATLIFFE-WALKER,** )
**TORI RAIFORD,** )
**TAMMY WILLIAMS** )
**JOSEPH BATEMAN** )
**PHILLIP WHITE** )

*Defendants*

---

## **COMPLAINT**

### **Preliminary & Jurisdictional Statement**

1.  The Virginia Department of Corrections ("VDOC") is responsible for the implementation and oversight of all policies governing Virginia's State Correctional facilities ("prisons" or "penitentiaries"), including all policies governing the specific facilities managed by the independently named wardens herein and prison facilities housing the Plaintiffs in this suit. Virginia's Governor Ralph Northam, Virginia's Secretary of Public Safety and Homeland Security Brian Moran, and the VDOC Director Harold Clarke are the official governing authorities for the VDOC and are responsible for implementing policies that govern prison staff, contractors, inmates, visitors, properties, and suppliers. Additionally, the wardens of each facility are responsible for implementing policies that also govern prison staff, contractors, inmates, visitors, properties and suppliers. The VDOC and its prisons are charged with providing humane conditions of confinement, medical care for inmates, nutrition, safety, and the protection of inmates' constitutional rights.

2.  In the past several weeks, the United States and the Commonwealth of Virginia have endured an unparalleled public health emergency in the form of a global pandemic, COVID-19. This emergency has strained the Commonwealth's resources, employment, regional healthcare services, and public institutions. In Virginia, it has caused thousands of infections and hundreds of deaths. By the time Court reads this, it is certain that more

Virginians have tested positive for the virus and someone new is at risk of death. Nevertheless, even a virus cannot dissolve those fundamental liberties protected in our nation's Constitution.

3.    The Eighth Amendment of the United States Constitution, as applied to the States via the Fourteenth Amendment, protects all Americans from cruel and unusual punishment at the hands of the State. Within that guarantee, the Supreme Court of the United States has recognized that this Eighth Amendment protection "does not mandate comfortable prisons," but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer* v. *Brennan*, 511 U.S. 825, 832 (1994). In its prohibition of "cruel and unusual punishment," the Eighth Amendment imposes duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id*. at 832–33 (citations omitted).

4.    The Plaintiffs are suffering from the Defendants' failure to adequately address the extreme health risk posed by COVID-19 and bring this suit seeking preliminary and permanent injunctive relief and a declaratory judgment from this honorable Court with the prayer that their Eighth and Fourteenth Amendment protections may intervene in their defense before it is too late. Therefore, this suit arises via 42 U.S.C. § 1983 and this Court has jurisdiction by way of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

**Plaintiff Parties**

5.     All of the Plaintiffs share a common interest and fall into a general class as inmates who are incarcerated in Virginia State Correctional Facilities subject to the control of the VDOC. Many of these Plaintiffs suffer from similar high-risk health conditions such as compromised respiratory systems, immune systems, and poor heart conditions. Other Plaintiffs find themselves similarly situated in that they are non-violent offenders or have served a significant portion of their active sentence of incarceration with little time left before release. Nevertheless, all Plaintiffs suffer from similar conditions of confinement as fellow inmates throughout the Virginia Department of Corrections in that they are in facilities that lack necessary equipment and medical supplies while housing hundreds of other inmates who are sleeping, eating, working, recreating, and being transported in a fashion that poses severe health risks. For these and other reasons stated herein, the Plaintiffs are collectively referred to in the several counts and factual allegations.

6.     Plaintiff BROOKE NICOLE WHORLEY, Offender ID No. 1600508, is currently incarcerated at the Virginia Correctional Center for Women ("VCCW") in Goochland County, Virginia following her conviction for the sale of controlled substances and a probation violation, all nonviolent crimes. Yesterday, Ms. Whorley tested positive for COVID-19. She is twenty-five (25) years old and her current release date is scheduled for June 23, 2021. She has served over two years of her three-year sentence and would return to her home with her husband in Afton, Virginia.

7.     Plaintiff MICHAEL PAUL SULLIVAN, Offender ID No. 1929509, is currently incarcerated in the Greensville Work Center in Greensville County, Virginia following his convictions of embezzlement and other financially related, nonviolent crimes. His release

date is currently scheduled to be June 30, 2022. Mr. Sullivan is forty-four (44) years old, he suffers from diabetes and high triglycerides. He has a wife and two sons who are minor children. Should he be released from incarceration, he will return to his home and family in South Hill, Virginia. Mr. Sullivan has had no negative infractions or "charges" while incarcerated, he advises several programs, and he is the church leader for an inmate worship group.

8.      Plaintiff GALE SHAWN JONES, Offender ID No. 1453087, is currently incarcerated in Fluvanna Correctional Center for Women in Fluvanna County, Virginia following her convictions for the distribution and manufacturing of controlled substances, all nonviolent crimes. Her release date is currently scheduled to be February 18, 2025. Ms. Jones is fifty (50) years old, she suffers from multiple sclerosis, chronic obstructive pulmonary disease ("COPD"), Hepatitis C, and she is a high stroke risk. Ms. Jones has had no negative infractions or "charges" while incarcerated. She will return home to her family in Covington, Virginia if released from incarceration.

9.      Plaintiff ALONZO LAMONT WILLIAMS, Offender ID No. 1986512, is currently incarcerated in Coffeewood Correctional Center in Culpeper County, Virginia following his convictions for the distribution and manufacturing of controlled substances as well as the possession of a firearm in Arlington Circuit Court, all of which were nonviolent crimes. He was sentenced to three years of active incarceration and has approximately thirteen months remaining. Mr. Williams is thirty-five (35) years old. He has only one lung as a result of tuberculosis and sleep apnea, the combination of which require him to use a medical device at night to assist with his breathing when he sleeps. Should he be released

from prison, Mr. Williams will return to his home and live with his mother in Pasadena, Maryland.

10.     Plaintiff DA'VON XAVIER WALKER, Offender ID No. 1674460, is currently incarcerated at Caroline Correctional Unit in Caroline County, Virginia following a probation violation and underlying original conviction of possession of a controlled substance, a nonviolent crime. Mr. Walker is twenty-six (26) years old and he is currently scheduled to be released on June 5, 2020 and will return to his home in Arlington, Virginia.

11.     Plaintiff DWIGHT ANTHONY HORTON, Offender ID No. 1588705, is currently incarcerated at the State Farm Enterprise Unit in Powhatan County, Virginia following his conviction for possession with intent to distribute a controlled substance and the revocation of a suspended sentence for the same incident, all of which are nonviolent crimes. Mr. Horton is forty (40) years old. He has served five years and has a release date of January 26, 2033. Mr. Horton suffers from asthma and chronic allergies. Should he be released, he will return to his home in Petersburg, Virginia.

12.     Plaintiff FRANK DOUGLAS FAIRCHILD, Offender ID No. 1760379, is currently incarcerated at the Indian Creek Correctional Center in Chesapeake, Virginia following his conviction for drug-related probation violations for an underlying crime involving possession of Schedule I/II substance, each are nonviolent crimes. Mr. Fairchild's current release date is scheduled for December 1, 2021. Should he be released, he will return to his home in Spotsylvania County, Virginia.

13.     Plaintiff CANDACE MARIE BLANKENSHIP, Offender ID No. 1534791, is currently incarcerated in Fluvanna Correctional Center for Women in Fluvanna County, Virginia following her convictions for a probation violation and underlying conviction of grand

larceny, a nonviolent crime. Ms. Blankenship is currently scheduled for release on May 4, 2020. Ms. Blankenship is twenty-seven (27) years old and she suffers from asthma and epilepsy. Should she be released from prison, she will reside in Charlottesville, Virginia.

14.     Plaintiff BRENDA RUND VAN EMMENIS, Offender ID No. 1583679, is currently incarcerated at the Virginia Correctional Center for Women ("VCCW") in Goochland County, Virginia following her conviction for multiple counts of embezzlement and other financial, nonviolent crimes. She is sixty (60) years old. She suffers from arthritis, loss of hearing due to untreated ear infections while in prison, high blood pressure, chronic allergies, and migraines. She has served six years of incarceration and her current release date is scheduled for October 21, 2022. Should she be released from prison, she will return to her home in Fluvanna County, Virginia.

15.     Plaintiff OLIVIA LYNN IVASHIN, Offender ID No. 1335220, is currently incarcerated at Fluvanna Correctional Center for Women in Fluvanna County, Virginia following her conviction for probation violation and underlying conviction of possession of a controlled substance, a nonviolent crime. Ms. Ivashin is currently scheduled to be released from prison on July 22, 2020. She is thirty-nine (39) years old and suffers from Hepatitis C and stress-induced seizures which require her to take Keppra, an anti-epileptic drug. Ms. Ivashin is awaiting adjudication regarding an alleged infraction that took place in 2019 while she was in prison and should she be found in violation of the internal policies, her "good time credit" would be rescinded and her time of incarceration will be extended. If she is released, she will return to her home in Broadway, Virginia.

16.     Plaintiff ENNIS THOMAS STEWART, Offender ID No. 1260838, is currently incarcerated at Coffeewood Correctional Center in Culpeper County, Virginia following

his convictions for a probation violation and an underlying felony offense of distribution of marijuana, a nonviolent offense. Mr. Stewart is forty (40) years old and he is currently scheduled to be released on November 29, 2021. Should he be released from prison, Mr. Stewart will return to his home in Manassas, Virginia.

17.     Plaintiff LARTAIJA MONAI BANKS, Offender ID No. 1442583, is currently incarcerated at Fluvanna Correctional Center for Women in Fluvanna County, Virginia following her conviction for forgery and embezzlement, nonviolent crimes. Ms. Banks' current release date is scheduled for August 17, 2020 but would have been in May of 2020 had her good time credit not been revoked. She suffers from high blood pressure and is thirty-one (31) years old. She will return to her home in Louisa County, Virginia following her release.

18.     Plaintiff MATTHEW DANIEL MOSHER, Offender ID No. 1450743, is currently incarcerated in the Haynesville Correctional Center in Richmond County, Virginia following his conviction for robbery and use of a firearm, an unloaded airsoft "bb" gun, in commission of a felony. At the time of this filing, Haynesville has three (3) confirmed inmate cases of COVID-19. Mr. Mosher previously served in the Coast Guard for nine years and was a first responder during 9/11, spending over a month recovering human remains at "Ground Zero" in New York City. He also served time assisting with the aftermath of Hurricane Katrina. As a result of his experience and the scenes he witnessed on a routine basis, Mr. Mosher suffers from PTSD. Mr. Mosher became addicted to prescription pain pills and then fell into an addiction of heroine. With these addictions as a motivating factor, Mr. Mosher engaged in illicit activity that resulted in his conviction of robbery with the use of an unloaded "bb" gun and in the cumulative sentence of eleven

years of active incarceration. Since being incarcerated, Mr. Mosher became the first person to graduate from the Sustaining Offender Addiction Recovery (SOAR) program at Augusta Correctional Center in July of 2019. He also completed his re-entry program and maintains a home plan. Mr. Mosher is at particular risk of suffering complications from COVID-19, as he has only one fully functioning lung and the other incapable of recovery due to a paralyzed diaphragm. Mr. Mosher requires the use of a CPAP machine, he has suffered pneumonia five times in the last four years, and recent medical tests have shown results suggesting he is suffering from pneumonia at the time of this filing. He is awaiting an X-ray scan for further tests, but the growing presence of COVID-19 cases has caused the medical unit in his prison to be closed. According to his most recent medical visit while incarcerated, Dr. Levine of the prison staff stated that COVID-19 would serve as a particularly worrisome infection given Mr. Mosher's compromised respiratory system and it would likely prove to be fatal.

19.    Plaintiff BRUCE WAYNE HARRIS JR., Offender ID No. 1116630, is currently incarcerated in Haynesville Correctional Center in Haynesville, Virginia following his conviction for his probation violation and failing to register as a sex offender, a nonviolent offense. He was sentenced to forty months of active incarceration and his current release date is scheduled for April 13, 2021. Mr. Harris is thirty-seven (37) years old and he suffers from high blood pressure. Should he be released from confinement, he will return to live with his wife at their home in Newport News, Virginia.

20.    Plaintiff JOHNATHAN WESLEY MCMILLAN, Offender ID No. 1199465, is currently incarcerated in Dillwyn Correctional Center in Buckingham County, Virginia as a result of his 2006 conviction of attempted capital murder following his attempt to evade law

enforcement at a high-speeds when he was twenty-one (21) years old. He was sentenced to fifteen (15) years of active incarceration and his release date is currently scheduled for February 17, 2021. Mr. McMillan is thirty-four (34) years old. Should he be released early, he will return to his home in Staunton, Virginia.

21.    Plaintiff MILTON VALENTINO WILLIAMS, SR., Offender ID No. 1460576, is currently incarcerated in Deerfield Men's Work Center located in Southampton County, Virginia as a result of his conviction for distribution of cocaine, a nonviolent crime. Mr. Williams received an active sentence of six years and his current release date is January 25, 2022. Mr. Williams is thirty-seven (37) years old and he suffers from diabetes. Should he be released from prison, he would leave the Commonwealth to live with his wife in Sunbury, North Carolina.

22.    Plaintiff TIMOTHY JAMES BRUMMETT, Offender ID No. 1470155, is currently incarcerated in Patrick Henry Correctional Unit in Ridgeway, Virginia following his conviction of being a nonviolent felon in possession of a firearm which also served as a probation violation for his previous conviction of grand larceny, each of which are nonviolent crimes. His current release date is scheduled for June 10, 2022. He is thirty-four (34) years old and should he be released, he will return to his home in Pittsylvania County, Virginia.

23.    Plaintiff ANTHONY DESHAWN VICKS, Offender ID No. 1153855, is currently incarcerated in Dillwyn Correctional Center in Buckingham County, Virginia following his five-year active sentence for a conviction for possession with intent to distribute a Schedule II drug, a nonviolent crime. His current release date is scheduled for July 6, 2021. Mr. Vicks suffers from diabetes and high blood pressure.  He is forty-eight (48) years old.

Should he be released from prison, he will return home to his wife, Renee Vicks in Albemarle County, Virginia.

24.     Plaintiff WARREN CORNELIUS BROOKS, Offender ID No. 1414807, is currently incarcerated at Caroline Correctional Unit in Caroline County, Virginia following his conviction of possession with intent to distribute a Schedule I/II controlled substance, a nonviolent crime. He is currently scheduled for release from incarceration on May 2, 2022 and should he be released at that time or earlier, he will return to his home in Henrico County, Virginia. Mr. Brooks is thirty-eight (38) years old and suffers from complications of a dislocated hip, an injury that has yet to receive adequate medical treatment while he has been incarcerated.

25.     Plaintiff JESSE ALLEN DAVENPORT, Offender ID No. 1180270, is currently incarcerated in Coffeewood Correctional Center in Culpeper County, Virginia following his convictions related to grand larceny via forging and uttering a bad check, a nonviolent crime. He is currently scheduled for release from incarceration on July 28, 2025. He suffers from Hepatitis C and has been denied treatment for his illness most recently after prison staff cited complications stemming from the ongoing COVID-19 pandemic. His condition is worsening due to the lack of care. Mr. Davenport is forty-five (45) years old and will return to his home in Spotsylvania, Virginia once he is released.

26.     Plaintiff WARREN MORRIS MEDLEY-GREEN, Offender ID No. 1109870, is currently incarcerated in Dillwyn Correctional Center in Buckingham County, Virginia following his convictions for driving after being declared a habitual offender, eluding the police, and other driving related charges, all of which are nonviolent crimes. Mr. Medley-Green is currently schedule for release from incarceration on January 31, 2022, and should he be

released at that time or earlier, he will return to his home in Harrisonburg, Virginia. Mr. Medley-Green is forty-eight (48) years old and suffers from asthma.

27. Plaintiff LAROG ANTHONY TROWELL, Offender ID No. 1366969, is currently incarcerated at Greensville Correctional Center in Greensville, Virginia following his conviction for a probation violation stemming from the possession with the intent to distribute controlled substances and a charge for solicitation to murder. He was originally sentenced to eleven (11) years in prison and has nine months left remaining on his active sentence, with release date of January 11, 2021. Mr. Trowell suffers from asthma, routinely suffers from bronchitis, and also has gastrointestinal problems. Should he be released, he will return to his home in Richmond, Virginia.

28. Plaintiff BENJAMEN WILLIAM FYFE, Offender ID No. 1682846, is currently incarcerated in the Greensville Work Center in Greensville County, Virginia following his conviction for robbery and use of a firearm in the commission of the offense. Prior to this incident, Mr. Fyfe had no prior record. He is currently scheduled to be released on September 1, 2022 and has been a model inmate. Should he be released early, he will return to his home in Smithfield, Virginia.

29. Plaintiff ANTONIO LEE PERRYEL, Offender ID No. 1049366, is currently incarcerated in Dillwyn Correctional Center in Buckingham County, Virginia following his conviction for being a prisoner in possession of marijuana and a 2003 conviction for robbery. His current release date is scheduled for April 4, 2033. Mr. Perryel is forty-four (44) years old and suffers from a compromised respiratory system due to chronic allergies. When he is released, he will leave the Commonwealth to return to his home with his wife in Waldorf, Maryland.

30.     Plaintiff DONNIE RAY OFFENBACKER, Offender ID No. 1198794, is currently incarcerated at Augusta Correctional Center in Augusta County, Virginia following his conviction for grand larceny, a nonviolent crime. Mr. Offenbacker is currently scheduled to be released from incarceration on June 23, 2023. He is thirty-seven (37) years old and will be returning to his home in Verona, Virginia upon his release.

31.     Plaintiff FELIPE FRANCO, Offender ID No. 1099251, is currently incarcerated at Coffeewood Correctional Facility in Culpeper County, Virginia following his conviction for conspiracy and distribution of cocaine, all nonviolent crimes. Mr. Franco has served nineteen (19) years in prison and has a release date of September 9, 2025. He is forty-eight (48) years old and would return to his family and home in Virginia.

32.     Plaintiff COURTNEY LASHAWN STROBLE, Offender ID No. 1199740, is currently incarcerated at the State Farm Correctional Facility in Powhatan County, Virginia following his conviction for being a nonviolent felon in possession of a firearm. His case remains on appeal to the Supreme Court of Virginia while he continues serving a five (5) year active sentence. If he were to be released, he would return to his family in Richmond, Virginia.

## Defendant Parties

33.     Defendant RALPH S. NORTHAM is the Governor of the Commonwealth of Virginia and our Commonwealth's Chief Executive Officer responsible for overseeing, managing, and directing policy for all Virginia agencies, including the Department of Public Safety and Homeland Security, which is the governing agency of the Virginia Department of Corrections ("VDOC").

34.   Defendant BRIAN MORAN is the Secretary of Public Safety and Homeland Security, having been reappointed to this position by Governor Northam. Secretary Moran is responsible for overseeing, managing, and directing policy for all agencies within the Department of Public Safety and Homeland Security, including the VDOC and its prisons.

35.   Defendant HAROLD C. CLARKE is the Director of the VDOC. He provides final approval of rules applicable to prison inmates. He is sued in his official capacity for declaratory and injunctive relief. At the time of this filing, the VDOC has publicly confirmed the presence of twenty-eight (28) positive cases of COVID-19 among VDOC's inmates and staff. The VDOC directly oversees all policies and institutional directives for all State Correctional facilities throughout the Commonwealth, including all of those managed by the wardens listed as defendants below.

36.   Defendant DONALD WILMOUTH is the warden of Virginia Correctional Center for Women ("VCCW") in and State Farm Work Center.  He is sued in his official capacity for declaratory and injunctive relief. At the time of this filing, VCCW and State Farm Work Center have publicly confirmed more than (12) inmates and twelve (12) staff members have tested positive for COVID-19. Under his direction, over twenty-four (24) cases have been confirmed.

37.   Defendant RICK WHITE is the warden of Indian Creek Correctional Center ("Indian Creek") in Chesapeake, Virginia. He is sued in his official capacity for declaratory and injunctive relief. At the time of this filing, Indian Creek has publicly confirmed one positive case of COVID-19 in an officer.

38.   Defendant THOMAS MEYER is the warden of State Farm Correctional Center and State Farm Enterprise Unit (collectively "State Farm") in Powhatan County, Virginia. He is sued

in his official capacity for declaratory and injunctive relief. At the time of this filing, State Farm has publicly confirmed one positive case of COVID-19 in an officer.

39.    Defendant TIKKI HICKS is the warden of Haynesville Correctional Center ("Haynesville") located in Haynesville, Virginia. She is sued in her official capacity for declaratory and injunctive relief. At the time of this filing, Haynesville has publicly confirmed one positive case of COVID-19 in an officer.

40.    Defendant RODNEY YOUNCE is the warden of Coffeewood Correctional Center ("Coffeewood"). He is sued in his official capacity for declaratory and injunctive relief.

41.    Defendant TRACY RAY is the warden of Greensville Work Center. He is sued in his official capacity for declaratory and injunctive relief.

42.    Defendant ERIC ALDRIDGE is the warden of the Fluvanna Correctional Center for Women, a State Correctional facility under the control of the VDOC. He is sued in his official capacity for declaratory and injunctive relief.

43.    Defendant DANA RATLIFFE-WALKER is the warden of Dillwyn Correctional Center ("Dillwyn"). She is sued in her official capacity for declaratory and injunctive relief.

44.    Defendant TORI RAIFORD is the warden of Caroline Correctional Unit. He is sued in his official capacity for declaratory and injunctive relief.

45.    Defendant TAMMY WILLIAMS is the warden of Deerfield Correctional Center and Deerfield Men's Work Center (collectively "Deerfield") located in Capron, Virginia. She is sued in her official capacity for declaratory and injunctive relief.

46.    Defendant JOSEPH BATEMAN is the warden of Patrick Henry Correctional Unit ("Patrick Henry") located in Ridgeway, Virginia. He is sued in his official capacity for declaratory and injunctive relief.

47.    Defendant PHILLIP WHITE is the warden of Augusta Correctional Center ("Augusta") located in Augusta County, Virginia. He is sued in his official capacity for declaratory and injunctive relief.

## Threat of COVID-19

48.    As of April 8, 2020, a new strain of coronavirus which causes COVID-19, is known to have infected over 1,500,000 people, leading to at least 80,000 deaths worldwide and 10,000 deaths in the United States. There are over 3,600 confirmed cases in Virginia and there have been 75 deaths as a result of COVID-19.

49.    COVID-19 (also referred to herein as "Coronavirus") is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

50.    COVID-19 was first identified in December 2019 in Wuhan, China, the capital of China's Hubei province, and has since spread globally, resulting in the ongoing 2019–20 coronavirus pandemic.

51.    Common symptoms of COVID-19 include fever, cough, and shortness of breath as well as muscle pain diarrhea, sore throat, loss of smell, and abdominal pain. The majority of COVID-19 cases result in mild symptoms, while some progress to viral pneumonia and multi-organ failure.

52.    COVID-19 is most commonly spread during close human contact via small droplets produced when people cough, sneeze, or talk. People may also catch COVID-19 by touching contaminated surfaces and then their face. The virus can survive on surfaces up to seventy-two (72) hours.

53.    It is most contagious during the first three days after symptom onset, although spread may be possible before symptoms appear and in later stages of the disease.

54.    Time from exposure to onset of symptoms is generally between two (2) and fourteen (14) days, with an average of five (5) days.

55.    The standard method of diagnosis is via reverse transcription polymerase chain reaction (rRT-PCR) from a nasopharyngeal swab.

56.    The infection can also be diagnosed from a combination of symptoms, risk factors and a chest CT scan showing features of pneumonia.

57.    Currently, there is no vaccine or specific antiviral treatment for COVID-19. Management involves treatment of symptoms, supportive care, isolation, and experimental measures.

58.    Those infected with the virus may be asymptomatic or develop flu-like symptoms including fever, cough, fatigue, and shortness of breath.

59.    Emergency symptoms include difficulty breathing, persistent chest pain or pressure, confusion, difficulty waking, and bluish face or lips; immediate medical attention is advised if these symptoms are present.

60.    Less commonly, upper respiratory symptoms, such as sneezing, nasal discharge ("runny nose"), or a sore throat may be seen. Symptoms such as nausea, vomiting, and diarrhea have been observed in varying percentages.

61.    For thousands of people, the disease has progressed to pneumonia, multi-organ failure, and death.

62.    The time from symptom onset to needing mechanical ventilation is typically eight (8) days for those suffering from severe symptoms.

63.    There is a delay between the moment when a person is infected with the virus and the time when they develop symptoms ("incubation" or "the incubation period").

64. The incubation period for COVID-19 is typically five (5) to six (6) days but may range from two (2) to fourteen (14) days.

65. Nearly ninety-eight percent of those who develop symptoms will do so within 11.5 days of infection.

66. Reports indicate that not all who are infected develop symptoms ("asymptomatic").

67. Asymptomatic cases contribute to the spread of the disease.

68. The World Health Organization (WHO) and Center for Disease Control (CDC) claim that COVID-19 is primarily spread during close contact and by small droplets produced when people cough, sneeze, or talk; with close contact being within 3 ft 3 in–9 ft 10 in. A study in Singapore found that an uncovered coughing can lead to droplets travelling up to 15 feet).

69. Respiratory droplets may also be produced during breathing out, including when talking. Though the virus is not generally airborne, the National Academy of Science has suggested that bioaerosol transmission may be possible and air collectors positioned in the hallway outside of people's rooms yielded samples positive for viral RNA.

70. The droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.

71. Some medical procedures such as intubation and cardiopulmonary resuscitation (CPR) may cause respiratory secretions to be aerosolized and thus result in airborne spread. It may also spread when one touches a contaminated surface, known as fomite transmission, and then touches their eyes, nose, or mouth.

72. The virus is most contagious when people are symptomatic; while spread is possible before symptoms appear.

73.     According to the European Centre for Disease Prevention and Control (ECDC), one person generally infects two to three others.

74.     The virus has been found to be detectable for one day on cardboard, for up to three days on plastic and stainless steel, and for up to four hours on copper and this varies based on humidity and temperature.

75.     The severity of COVID-19 varies, as the disease may take a mild course with few or no symptoms, resembling other common upper respiratory diseases while mild cases typically recover within two weeks.

76.     Those with severe or critical diseases may take three to six weeks to recover and among those who have died, the time from symptom onset to death has ranged from two to eight weeks.

77.     Children are susceptible to the disease but are likely to have milder symptoms and a lower chance of severe disease than adults; in those younger than fifty (50) years, the risk of death is less than 0.5%, while in those older than 70 it is more than 8%.

78.     In those most severely affected, COVID-19 may rapidly progress to acute respiratory distress syndrome (ARDS) causing respiratory failure, septic shock, or multi-organ failure.

79.     Complications associated with COVID-19 include sepsis, abnormal clotting, and damage to the heart, kidneys, and liver.

80.     Clotting abnormalities, specifically an increase in prothrombin time have been described in six-percent of those admitted to hospitals with COVID-19, while abnormal kidney function is seen in four-percent of this group. Liver injury as shown by blood markers of liver damage is frequently seen in severe cases.

81.    Many of those who die of COVID-19 have pre-existing conditions including hypertension, diabetes, cardiovascular disease, and heart disease.

82.    Due to the respiratory complications that can arise from COVID-19, those with compromised lung capacity as a result of certain conditions including asthma, emphysema, chronic obstructive pulmonary disease ("COPD"), lung cancer, or the removal of one lung are at higher risk of death should complications arise.

**Basic Practices And Accepted Norms In Response To COVID-19**

83.    A vaccine is not expected until 2021, therefore a key part of managing COVID-19 is trying to decrease the epidemic peak, known as "flattening the curve," by slowing the infection rate to decrease the risk of health services being overwhelmed, allowing for better treatment of current cases, and delaying additional cases until effective treatments or a vaccine become available.

84.    Preventive measures to reduce the chances of infection include avoiding public spaces and gathering, avoiding crowded places, washing hands with soap and water often and for at least twenty-seconds, practicing good respiratory hygiene, and avoiding touching the eyes, nose, or mouth with unwashed hands.

85.    The CDC recommends covering the mouth and nose with a tissue when coughing or sneezing and recommends using the inside of the elbow if no tissue is available. It also recommends proper hand hygiene after any cough or sneeze.

86.    Recommended measures to prevent infection include frequent hand washing, the wearing of gloves, "social distancing" by maintaining a physical distance of six (6) to twelve (12) feet from others, especially from those with symptoms, the covering coughs and sneezes with a tissue or inner elbow, and keeping unwashed hands away from the face.

87.   Medical professionals, including Governor Northam, recommend the use of masks for everyone, especially those who suspect they have the virus and their caregivers. A particular model of masks ("N95 masks") is considered to serve particularly well to protect against the inhalation and exhaling of contaminated air.

88.   Recommendations for mask use by the general public vary, with many authorities requiring their use.

89.   "Social distancing" strategies aim to reduce contact of infected persons with large groups by closing schools and workplaces, restricting travel, and cancelling mass gatherings. Social distancing also includes that people stay at least six feet apart.

90.   According to the WHO, the use of masks is recommended only if a person is coughing or sneezing or when one is taking care of someone with a suspected infection. Some countries and States recommend healthy individuals wear face masks.

91.   Governor Northam has suggested all people wear masks while in public regardless of whether they have shown symptoms of COVID-19.

92.   In order to meet the need for masks, the WHO estimates that global production will need to increase by forty-percent (40%).

93.   Those diagnosed with COVID-19 or who believe they may be infected are advised by the CDC to stay home except to get medical care, call ahead before visiting a healthcare provider, wear a face mask before entering the healthcare provider's office and when in any room or vehicle with another person, cover coughs and sneezes with a tissue, regularly wash hands with soap and water, and avoid sharing personal household items.

94.   The CDC also recommends that individuals wash hands often with soap and water for at least 20 seconds, especially after going to the toilet or when hands are visibly dirty, before

eating and after blowing one's nose, coughing, or sneezing. It further recommends using an alcohol-based hand sanitizer with at least sixty-percent alcohol, but only when soap and water are not readily available.

## Response To COVID-19 & Spread Throughout The Commonwealth

95.    On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.

96.    On March 13, 2020, the President of the United States declared a national emergency in response to the public threat to health posed by COVID-19.

97.    On March 12, 2020, Virginia's Governor Ralph Northam declared a State of Emergency in response to the threat to health posed by COVID-19.

98.    On March 17, 2020, the Honorable Chief Justice Lemons of the Virginia Supreme Court declared a Judicial Emergency in light of COVID-19 and ordered all General District and Circuit Court proceedings to be halted, subject to a narrow list of exceptions requiring immediate judicial attention.

99.    On March 19, 2020, Governor Northam and Brian Moran, Virginia's Secretary of Public Safety, requested law enforcement, prosecutors, and judges to consider alternatives to incarceration as a result of this pandemic.

100.   On March 20, 2020, Governor Northam activated the National Guard to aid Virginians during the State of Emergency posed by COVID-19.

101.   On March 30, 2020, Governor Northam enacted Executive Order No. 55 ("EO55") which ordered, in part: "All individuals in Virginia shall remain at their place of residence, except as provided below by this Order and Executive Order 53. To the extent individuals use shared or outdoor spaces, whether on land or on water, they must at all times maintain

social distancing of at least six feet from any other person, with the exception of family or household members or caretakers."

102.    EO55 closed all public universities, beaches, and ordered "[a]ll public and private in-person gatherings of more than ten individuals are prohibited," including "parties, celebrations, religious, or other social events, whether they occur indoor or outdoor."

103.    Violations of ¶¶ 2–5 of Governor Northam's EO55 were deemed punishable as Class 1 misdemeanors via Va. Code § 44–146.17.

104.    At a public press conference on April 6, 2020, Governor Northam recognized the value of wearing masks as a means of reducing the risk of COVID-19 contamination. At the press conference, he demonstrated the proper way to wear a mask, covering both the mouth and nose, using a mask made by the inmates in the VDOC.

105.    Some inmates in the VDOC are being coerced to make these masks via fear of losing their "good time credits" if they do not participate, even though these work environments involve high population density, do not adhere to social distancing requirements, and VDOC's inmates do not have universal access to these masks themselves.

106.    At the same press conference, Governor Northam publicly recognized and reiterated the importance of personal protective equipment (i.e. masks, gloves, sanitizers, etc.) as well as the value and importance of COVID-19 testing and medical equipment such as ventilators.

107.    Governor Northam and the Commonwealth are working with the Army Corps of Engineers to identify alternative healthcare facilities due to the expected impact and complications of overwhelming population at traditional hospitals and healthcare facilities.

108. Neither Governor Northam nor Secretary Moran have ordered Virginia's state government to identify alternative facilities or alternative methods of incarceration for inmates in the VDOC prison system.

109. On April 3, 2020, President Trump declared Virginia to be a "major disaster area" in light of the impact and spread of COVID-19.

110. On April 3, 2020, United States Attorney General William Barr issued a State of Emergency within the U.S. Bureau of Prisons due to the threat posed by COVID-19 in the prison population and ordered the expedited release of inmates to home confinement via the use of home electronic GPS ankle monitoring.

111. Additional protective measures have been taken throughout the Commonwealth and the United States, including primary and secondary school closures, and other limits on governmental and commercial activity. The U.S. Department of Treasury deemed the threat so serious that it went so far as to extend the filing deadline for reporting taxes by three months.

112. There are over 2,600 known cases of COVID-19 in Virginia, with over 60 deaths coming as a result.

113. As of April 6, 2020, COVID-19 has been positively identified in more than nineteen (19) inmates in Virginia's prison system and at least twenty-one (21) staff members or contractors of the VDOC.

114. The number of Virginia inmates and staff that are infected with COVID-19 is possibly higher than those figures reported due to the lack of testing and policies requiring testing of all inmates and staff who have been in contact with those who are known to be infected.

115.    The Center for Disease Control issued guidance that individuals are at higher risk of contracting COVID-19 when in tightly crowded areas and all government entities have suggested individuals are to stay home as much as possible.

116.    The conditions of confinement throughout the correctional facilities in VDOC create an ideal environment for the transmission of COVID-19.

### Conditions of Confinement & Institutional Practices That Pose Heightened Risks of Infection in Virginia's Prison System

117.    Inmates and staff cycle in and out of Virginia's correctional facilities from multiple regions of the Commonwealth.

118.    Multiple service providers and contractors leave and return daily without COVID-19 testing.

119.    Incarcerated people oftentimes have poorer health than the general population and, even in the best of times, medical care is limited.

120.    Most of Virginia's State Correctional facilities are located in rural or remote regions of the Commonwealth and are relatively far from Virginia's largest hospitals and other medical resources.

121.    According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," "infection control is challenging in these settings."

122.    Prisons are amplifiers of infectious diseases such as COVID-19 because the practices that keep diseases from spreading, such as social distancing, are inherently more onerous to achieve in VDOC State Correctional facilities because these prisons engage in high-density, centrally housed confinement and therefore have infrastructural limitations on space, resource allocation, and staff-to-inmate ratio.

123. In Virginia's local jail system, multiple localities, Commonwealth Attorneys, jail superintendents, and circuit courts have taken measures to limit inmate contact with outside individuals, including limits on contact visits between clients and attorneys. Multiple jails throughout the Commonwealth of Virginia have ordered the early release of select prisoners as well as the release and continued incarceration of inmates via home electronic GPS monitoring.

124. The Plaintiffs are currently housed in compact quarters in State Correctional facilities with no less than ten (10) but as many as ninety (90) other adult inmates in their immediate housing facility, while many of these facilities house hundreds or thousands of inmates. These facilities are overcrowded during the COVID-19 pandemic. Many of these inmates come and go from the prison on a routine basis and have been in contact with other inmates, VDOC Staff, and contractors who have contracted the virus.

125. The Defendants' facilities use cycled air, community washed clothing, community accessed and prepared food, equipment, and community accessed supplies in a fashion that enhances the likelihood of contamination and infection for the Plaintiffs and those in their class.

126. The Defendants' facilities use community accessed phones, computers, books, libraries, tables, chairs, games, cards, televisions, remotes, doors, cells, light fixtures, and other similar items used in daily life.

127. The Defendants' facilities are not adhering to any material form of "social distancing" policies insofar as inmates are forced to:

A. Sleep in quarters that are in open-air dormitories that house as few as twelve (12) and as many as ninety (90) other adults on beds, cots, or foam mattresses that are as close in proximity as approximately two (2) feet apart from other inmates;

B. Be transported via vehicles with more than ten (10) and as many as thirty (30) other inmates with little-to-no space between passengers;

C. Congregate in open areas of other inmates that range from more than ten (10) and up to ninety (90) others at a time.

D. Attend programming, classes, and other facility-managed gatherings of more than ten (10) in quarters that do not afford the opportunity for social distancing between inmates and staff.

E. Work in quarters, both inside and outside, in which the inmates are in large gatherings that do not comply with the medically or State-suggested limits in the number of individuals present or the distance from person to person.

128. The Defendants have failed to enact mandatory or uniform policies for staff, contractors, or inmates that present a material form of protection for inmates via the required use of masks, gloves, sanitizer, or other sanitation protection for the staff, inmates, their equipment, phones, computers, clothing, food, or other items in daily use.

129. In one specific instance on Monday, April 6, 2020 at Dillwyn Correctional Center, a correctional officer was confronted by inmates for failure to wear her mask while conducting inspections of the housing unit. A verbal altercation ensued resulting in the correctional officer stating that she did not need to wear the mask and that she hoped the inmates did get infected with COVID-19. Approximately twenty-five (25) inmates filed a

grievance against this correctional officer, with one inmate receiving a "charge" or negative conduct record as a result.

130. There is no policy at any of the Defendants' facilities that suggests or guarantees negative consequence for Defendants' employees for failure to use masks, gloves, sanitizer, or other equipment meant to deter the spread of COVID-19.

131. The Defendants have failed to implement any uniform policies to materially limit social gatherings or adhere to social distancing guidelines, with some continuing to threaten negative treatment of inmates or threaten to record internal violations ("charges") that place an inmate's "good time credit" for early-release from incarceration if such inmates fail to attend work requirements, internal programs, or courses that continue to consist of more than ten (10) inmates in close quarters that do not allow or require distance between those who are present.

132. In some instances, the Defendants have ordered stays on inmate gatherings for religious exercises while maintaining the forced gathering and transportation of more than ten (10) inmates to and from daily work requirements in tight quarters that do not comply with the suggested parameters of social distancing.

133. Specifically, the threats of COVID-19 have been cited as a reason to deny the religious church gatherings traditionally led by Plaintiff SULLIVAN, even though he is required to attend his daily work routine with larger gatherings of inmates in tighter quarters for explicit threat of retribution that would negatively impact his "good time credit."

134. The Defendants have ended several forms of medical treatment for inmates suffering from chronic diseases and otherwise life-threatening illnesses due to the risks posed by COVID-19.

135. Specifically, the threats of COVID-19 have been cited as a reason to deny the medical treatment of Hepatitis C for Plaintiff DAVENPORT.

136. The Defendants have denied and do not maintain any form of alternative sentencing measures such as home electronic GPS ankle monitoring that would protect inmates from large, crowded housing units.

137. In some instances, the Defendants removed materials from inmates, including gloves, that would otherwise serve to protect these inmates from exposure to COVID-19.

138. The Defendants lack the necessary amount of tests for COVID-19 and do not adhere to any testing policies for inmates or staff but for removing and testing individuals who show overt symptoms of COVID-19 and checking the temperatures of staff that enter the facility.

139. Many individuals who contract COVID-19 do not show symptoms, including elevated temperatures, even when they remain highly contagious, therefore it is possible that a contagious individual does not have high body temperature or show any outward symptoms.

140. The mere testing of staff for an elevated temperature prior to entering a facility is insufficient for determining whether such individual is infected.

141. The Defendants know or have the reason to know that contagious individuals may not show symptoms of COVID-19 and may not display a high body temperature yet they continue to adhere to policies that require the interaction of large crowds of inmates and staff in tight quarters.

142. The Defendants continue to implement programming in some instances where inmates leave the prison for off-grounds activity where they engage with members of the public and then do not quarantine these inmates from the general population.

143.    The Defendants are responsible for providing reasonable care and resources for the Plaintiffs and those in Plaintiffs' class as inmates are wards of the State.

144.    The Defendants have taken no action to identify and remove several of the Plaintiffs and those in Plaintiffs' class who are at particularly high risk of suffering from complications from COVID-19. The Defendants have not amended any procedures, policies, or guidelines for the housing of inmates that suffer from chronic health-related issues, those who are elderly, or those who have compromised respiratory systems.

145.    Specifically, Defendants NORTHAM, MORAN, and CLARKE have failed to issue or enforce material guidelines or policies requiring State Correctional facilities to identify elderly inmates or inmates with known risks to their respiratory system, cardiovascular system, or acute threats to their immune system even though such inmates are known to be at a high risk of suffering material, even fatal, complications from COVID-19.

146.    Additionally, Defendants NORTHAM, MORAN, CLARKE, WILMOUTH, WHITE, MEYER, and HICKS have failed to issue or enforce any material, requisite guideline or policy for the removal of those individuals most at risk from the largest of housing units with general quarantine policies and placing these at-risk individuals in housing units with more uniquely-tailored sanitation or quarantine policies or in units smaller gatherings of individuals.

147.    The Defendants have not procured or attempted to procure the amount of hygienic or sanitary supplies reasonably necessary for inmates to protect themselves against contracting COVID-19.

148.   The Defendants have not procured or attempted to procure the amount of ventilators reasonably necessary of the number of inmates to protect them or treat them as a result of COVID-19.

149.   The Defendants have not procured or attempted to procure the amount of COVID-19 tests reasonably necessary to ensure the routine assessment of inmates, staff, or contractors.

150.   The Defendants have not enacted or attempted to enact any form of alternative method of incarceration, such as home electronic GPS ankle monitoring ("home electronic monitoring" or "HEI"), as a means of reducing the density of their prison population in response to the risk posed by compact social gatherings of inmates.

151.   The Defendants have not enacted or attempted to enact any policies related to the use of "charges," or the implementation of internal infractions against the Plaintiffs and the Plaintiffs' class, some of which threaten the removal of "good time credit" that would result in early release from incarceration.

152.   The Defendants have not enacted any policy to retroactively reconsider or review prior decisions to remove inmates' "good time credit" as a means of expediting the release of inmates and reducing the housing density, thereby failing to take actions that would reduce the prison population and release inmates who could otherwise be eligible for removal.

153.   The Defendants continue to have staff delivering food to inmates without requiring the mandatory use of gloves or masks and in some instances threaten or enact policies of taking away the food of inmates if inmates are not wearing this equipment themselves.

154.   The Defendants continue to foster an environment where inmates, including Plaintiffs and those in Plaintiffs' class, are required or coerced to work outside of the prison in an

environment where they interact with the public, thereby exposing them directly and indirectly to the threat of COVID-19 from outside sources.

155.   The Plaintiffs, as inmates, are wards of the Commonwealth of Virginia and remain protected by the Constitution of the United States, specifically the Eighth Amendment's guarantee that they are to be protected from cruel and unusual punishment as applied to the States via the Fourteenth Amendment.

156.   The Defendants have a duty to these inmates and these Plaintiffs to provide, protect, and ensure contemporary standards of decency and, at a minimum, the civilized measure of life's necessities.

157.   The Defendants know that those who contract COVID-19 are at a serious risk of infecting anyone they may come in close contact with.

158.   The Defendants know that those who contract COVID-19 can and do suffer damage to their own health and those with aforementioned risk-factors can and do suffer from serious complications that can and do prove to be fatal.

159.   The Defendants know that COVID-19 poses a serious and significant risk of physical injury to all persons and Plaintiffs, especially those suffering from old age or compromised health.

160.   The Defendants know or have reason to know that an individual may be infected with COVID-19 and contagious even though such individual is unaware of their infection and asymptomatic.

161.   The Defendants know or have reason to know that an individual who is infected with COVID-19 and shows noticeable symptoms of the virus has typically been infected and contagious for several days.

162.    The Defendants know that their staff and contractors have contact with individuals outside of their employment and are at risk of being unknowingly infected with COVID-19.

163.    The Defendants know that inmates are at risk of contracting COVID-19 without the inmate's knowledge.

## Causes of Action

### I.      Cruel and Unusual Punishment
### (Population Density & Spatial Limitations)

164.    The Plaintiffs and their class incorporate and re-allege all facts previously stated in ¶¶ 1–163 in this Complaint.

165.    The Defendants know or have reason to know the housing conditions, including size of confinement and population density, along with the health risks of particular inmates, including the Plaintiffs.

166.    The Defendants know that COVID-19 is commonly spread via transmission as a result of close human contact.

167.    The Defendants know that close contact between and among many persons creates a heightened and more serious and significant risk of spreading COVID-19.

168.    The Defendants know that VDOC staff, contractors, and inmates come into close contact with each other and other persons on a constant basis.

169.    The Defendants know or have reason to know that VDOC staff, contractors, and inmates have come in contact with or at a serious and substantial risk of unwittingly coming in contact with other individuals who have been infected with COVID-19 or objects that are contaminated with the virus.

170.   The Defendants know that VDOC inmates, including the Plaintiffs, do routinely live, eat, work, and generally congregate in high-density settings that involve close contact between and among many persons and many objects.

171.   The Defendants know or have reason to know that increasing the spatial distance between individuals, specifically by six feet or more, and reducing the amount of individuals in a closed setting, specifically to a number of ten people or less, is a means of reducing the risk of spreading COVID-19.

172.   Increasing spatial distance between individuals and limiting the number of individuals in close quarters are practices that are not only widely accepted societal norms during COVID-19 pandemic, they have been publicly encouraged via officials at all levels of Government, commercial enterprise, and American culture. In Virginia, these practices have been enacted into law in most settings via Executive Orders promulgated by Governor Northam.

173.   These aforementioned practices of distancing and limiting population density are contemporary standards of decency.

174.   The Defendants know or have reason to know that increasing spatial distance between individuals and limiting the number of individuals in a particular setting during the ongoing COVID-19 pandemic is a contemporary standard of decency recognized throughout the United States and the Commonwealth of Virginia.

175.   The Defendants know that the VDOC inmates, including the Plaintiffs, along with staff and contractors, are not in a setting, are not subject to an environment, and are not provided or protected by prison policies, resources, or infrastructure that offers or requires the spatial

distance or reduction in close-quarter population that is reasonably necessary to protect against the substantial risk of spreading COVID-19.

176.    The Defendants know that this substantial risk of spreading COVID-19 to and among inmates, including the Plaintiffs, poses a substantial, serious, and significant risk to the physical health of these inmates and these Plaintiffs.

177.    The Defendants know or have reason to know of other reasonable efforts, practices, policies, resources, and infrastructure that can be established to provide the spatial distance and reduction in population density necessary to reduce this ongoing risk, nevertheless these Defendants refuse to do so.

178.    The Defendants know or have reason to know that the continued use of buses, vans, and high-density transportation poses a significant health risk due to spatial limitations and population density.

179.    The Defendants know or have reason to know that the continued threat of giving "charges" or negative infractions to inmates as a result of an inmate's unwillingness to participate in a spatially-limited, high-population program, class, or event forces or unduly coerces an inmate to engage in activity that is a serious, substantial, and significant risk to their health.

180.    The Defendants know or have reason to know that the elimination of "good time credit" or opportunity for early release of an inmate who may otherwise qualify for release during the COVID-19 pandemic increases the population density in these facilities and poses a serious, substantial, and significant health risk to that inmate along with all others.

181.    The Defendants know or have reason to know that VCOD's failure to implement alternative sentencing, alternative housing measures, and alternative methods of incarceration enhances the risks of spatial limitations and population density in a fashion

that poses a serious, substantial, and significant risk to those inmates who could reasonably be subject to such alternatives as well as those who remain confined according to the status quo.

182.   The Defendants have a duty to protect the Plaintiffs and those in their class from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving them in an extreme manner via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

## II.    Cruel and Unusual Punishment
### (Lack of Supplies, Equipment, & Sanitation Policies for Inmates)

183.   The Plaintiffs incorporate and reallege all facts stated previously in ¶¶ 1–163 in this Complaint.

184.   The Defendants know or have reason to know that COVID-19 is commonly spread via transmission from its location on an object that was in the presence of an infected individual to the skin of an uninfected individual.

185.   The Defendants know or have reason to know that inmates, including the Plaintiffs, along with staff and contractors routinely use of many objects by and among many persons and such use creates a heightened and more serious and significant risk of spreading COVID-19.

186.   The Defendants know that VDOC staff, contractors, and inmates come in contact with objects commonly used by many others on a routine and constant basis and such contact during a pandemic without additional measures poses a serious, significant, and substantial risk of spreading COVID-19.

187.   The Defendants know or have reason to know that COVID-19 can be transmitted from an infected individual's mouth or nose to outward places on their body, their clothing, nearby

objects, nearby individuals, and the air generally via the infected person's breathing, coughing, or sneezing.

188.   The Defendants know or have reason to know that the COVID-19 virus can remain contagious once transmitted to an object can infect another individual once that object has been touched with a hand or clothing and such individual subsequently touches their face with that hand or clothing.

189.   The Defendants know or have reason to know that there are supplies, equipment, tools, and chemicals that can reduce or prevent the transmission of COVID-19 from an infected individual to others, whether that is via object-to-person or airborne.

190.   Such supplies, equipment, tools, and chemicals include items such as reusable and disposable masks, reusable and disposable gloves, hand sanitizer, liquid and bar soap, disinfecting wipes, rags, or cloth, aerosol spray, and disposable coverings for commonly touched items.

191.   The practice of using, requiring, or providing these sort of supplies, equipment, tools, and chemicals is a common societal practice during the COVID-19 pandemic. So much so, that Governor Northam publicly referenced and displayed the use of these tools, specifically a wearable mask, in his address to the Commonwealth on April 6, 2020.

192.   The use and provision of these and similar items have been recommended by public officials in all levels of Government, commercial enterprises, and in cultural reference.

193.   The practice of using, requiring, and providing these and similar items during the COVID-19 pandemic are contemporary standards of decency.

194.   The Defendants know or have reason to know that using, requiring, and providing these and similar items during the ongoing COVID-19 pandemic is a contemporary standard of decency recognized throughout the United States and the Commonwealth of Virginia.

195.   Failure to provide and require these and other similar items for inmates poses a substantial, serious, and significant risk of spreading COVID-19 to and among inmates via objects and the air.

196.   The Defendants know or have reason to know that the VDOC inmates, including the Plaintiffs, along with staff and contractors, are not provided or protected by prison policies, resources, or infrastructure that offers or requires these or other similar items that are reasonably necessary to protect against the substantial risk of spreading COVID-19.

197.   The Defendants know that this substantial risk of spreading COVID-19 to and among inmates, including the Plaintiffs, poses a substantial, serious, and significant risk to the physical health of these inmates and these Plaintiffs.

198.   Unlike private citizens seeking medical attention in the public at-large, these VDOC inmates are wards of the Commonwealth of Virginia, therefore it is the Commonwealth's duty to ensure the protection of their health. Defendants NORTHAM and MORAN have specifically failed to account for this risk by placing the VDOC and its prisons in a position where the VDOC must compete with other entities to receive State-procured personal protective equipment.

199.   The Defendants know or have reason to know of reasonable efforts, practices, policies, resources, and infrastructure that can be established to provide and require these items for inmates during this ongoing risk, nevertheless these Defendants refuse to do so.

200. The Defendants have a duty to protect the Plaintiffs and those in their class from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving them in an extreme manner via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

### III.   Cruel and Unusual Punishment
### (Lack of Basic Supplies, Equipment, & Sanitation Policies for Staff)

201. The Plaintiffs incorporate and re-allege the facts previously stated in ¶¶ 1–163 as well as ¶¶ 184–94 of this Complaint.

202. The VDOC and its several State Correctional facilities lack any uniform or explicit policies governing prison Staff's or contractor's requisite provision and use of items that are known to protect against the transmission of COVID-19 to objects or other persons.

203. Specifically, there is no explicit or uniform policy governing Staff or contractor use of masks, gloves, disinfectant sprays or wipes, disposal of waste, use of disposable coverings for commonly touched items, or application of accurate COVID-19 testing.

204. Failure to require prison staff and contractors to adhere to such policies regarding these and similar items presents a significant, substantial, and serious risk of continuous transmission of COVID-19 from staff and contractors who leave the prison on a daily basis to interact with the public and then return to the prison to interact with inmates and the objects they routinely use.

205. Requiring staff and contractors to have these items and use these items, along with other risk-reducing measures, is a contemporary standard of decency that the Defendants know or should know will reduce the serious, significant, and substantial risk of spreading COVID-19 to the inmates and Plaintiffs and jeopardizing their health.

206. The Defendants know that this substantial risk of spreading COVID-19 to and among inmates, including the Plaintiffs, poses a substantial, serious, and significant risk to the physical health of these inmates and these Plaintiffs.

207. The Defendants know or have reason to know of reasonable efforts, practices, policies, resources, and infrastructure that can be established to provide and require these items for staff and contractors during this ongoing risk, nevertheless these Defendants refuse to do so.

208. The Defendants have a duty to protect the Plaintiffs and those in their class from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving them in an extreme manner via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

### IV. Cruel and Unusual Punishment
### (Lack of Medical Supplies, Equipment, & Testing for Inmates and Staff)

209. The Plaintiffs incorporate and re-allege the facts previously stated in ¶¶ 1–163 of this Complaint.

210. Testing individuals for COVID-19 is an important and requisite measure to reduce the spread of the virus because it affords the infected individual, medical professionals, policymakers, and the public an opportunity to not only provide the care needed to treat the symptoms of the disease but to also quarantine, isolate, or remove that individual from uninfected persons as a means of limiting exposure and spread of the virus.

211. Testing also affords the infected individual, medical professionals, policymakers, and the public an opportunity to proactively assess who, what, when, and where the infected person may have come in contact as a means of preemptively disinfecting contaminated objects or monitoring those who may incubating COVID-19 without showing symptoms.

212.    Diagnosing individuals for COVID-19 requires the use of specific tests which must be ordered and transported from manufacturing facilities and these tests are not reusable.

213.    Determining whether an individual has a high temperature or fever is not a means of testing for COVID-19 but is merely a way to assess whether they have a commonly occurring symptom of the disease.

214.    Along with COVID-19 tests, other forms of medical equipment, such as ventilators, are necessary for diagnosing the disease, treating the symptoms, and limiting the spread of the virus. Proactively procuring this medical equipment has become a contemporary standard of decency for Governmental entities, particularly those charged with the care of individuals.

215.    Because the VDOC inmates and these Plaintiffs are wards of the State, the Defendants have a duty to proactively procure basic medical supplies for testing, diagnosing, treating, and preventing the spread of COVID-19 among its staff, contractors, and inmates so as to protect and treat the inmates.

216.    The Defendants have not procured or introduced the basic number of COVID-19 tests, ventilators, or other medical equipment to satisfy the contemporary standard of decency for diagnostic testing or treatment.

217.    The Defendants failure to procure these medical supplies poses a significant, substantial, and serious risk to the inmates insofar as a supply shortage is known to result in a lack of diagnosing infected individuals and therefore eliminates the ability to quarantine as a means of limiting infection.

218.    The Defendants failure to procure these medical supplies poses a significant, substantial, and serious risk to the inmates insofar as a supply shortage is known to result in a lack of

diagnosing and providing adequate treatment for infected inmates that suffer from severe symptoms.

219. Government entities at all levels, including those throughout the Commonwealth of Virginia, along with private commercial enterprise, have taken are continuing to take the preemptive steps to procure these and other medical equipment.

220. The Defendants are charged with providing the basic necessities of medical care for these inmates.

221. Having access to the appropriate number of COVID-19 tests, ventilators, and other medically necessary equipment is a contemporary standard of decency and a basic provision by healthcare providers and those charged with providing such care.

222. The Defendants know or should know that the lack of tests, testing policies, ventilators, and other medical equipment poses a significant, substantial, and serious risk to the health of these inmates due to the risk of spreading COVID-19 and suffering complications from severe symptoms.

223. The Defendants have a duty to protect the Plaintiffs and those in their class from these conditions and these risks, they have not done so in a reasonable fashion, and are therefore depriving them in an extreme manner via conditions of confinement that constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment.

### Prayer for Relief

WHEREFORE, the Plaintiffs respectfully request for this honorable court to:

A. Assume jurisdiction over this action;

B. Declare the Defendants' failure to enact polices to reduce the population density in VDOC prisons during the COVID-19 pandemic results in conditions of confinement that present

such an imminent risk to the Plaintiffs' health that it violates their Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the States by the Fourteenth Amendment;

C.  Declare the Defendants' failure to enact policies requiring and providing personal protective equipment and sanitary supplies and practices during the COVID-19 pandemic for the Plaintiffs that it results in conditions of confinement that present such an imminent risk to health that it violates their Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the States by the Fourteenth Amendment;

D.  Declare the Defendants' failure to enact policies that require VDOC staff and contractors to use personal protective equipment, COVID-19 tests, and engage in additional measures to reduce the transfer and spreading of the virus that it produces conditions of confinement that present such an imminent risk to health that it violates their Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the States by the Fourteenth Amendment;

E.  Declare the Defendants' failure to procure adequate medical testing equipment, ventilators, and other items considered reasonably necessary in the diagnosis, prevention, and treatment for COVID-19 that it produces conditions of confinement that present such an imminent risk to health that it violates the Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the States by the Fourteenth Amendment;

F.  Grant a preliminary and permanent injunction to:

i.      Mandate the Defendants to implement immediate, material policies to alleviate the population density in the State Correctional Facilities as a means of enhancing the practice known as social distancing;

ii.     Order the Defendants to implement immediate, material policies to separate inmates into housing such that the number of inmates in an individual housing unit materially decreases and the space between sleeping and recreational areas increases;

iii.    Ordering the Defendants to implement alternative methods of incarceration, specifically the use of home electronic GPS ankle monitoring, as a means of alleviating the population density in the VDOC facilities;

iv.     Ordering the Defendants to identify and release at-risk portions of the inmate population to alternative confinement based on their age and health records as a means of alleviating the population density in the VDOC facilities;

v.      Ordering the Defendants to forego the removal of "good time credit," the availability of an adjusted release date, or early release from incarceration for inmates scheduled for release during the Commonwealth's State of Emergency as a means of alleviating the VDOC population density;

vi.     Ordering the Defendants, as a means of alleviating the VDOC population density, to review and reverse past rescission of "good time credit" for inmates who would otherwise be eligible for release immediately through June 10, 2020, with the option to extend such order to a later date should the need arise;

vii.    Ordering the Defendants to cease and desist from threatening or placing negative infractions, issuing "charges" on the record of inmates, or revoking "good time

credit," for an inmate's refusal to engage in programs, courses, work requirements, or other VDOC activities in which more than ten (10) inmates are required to be close quarters;

viii.    Ordering the Defendants to enact uniform policies requiring the immediate procurement, provision, and use of personal protective equipment and other health measures by VDOC staff, particularly those who come into regular personal contact with inmates, their goods, supplies, commissary, and food;

ix.    Ordering the Defendants to enact uniform policies requiring the immediate procurement and provision of personal protective equipment to inmates;

x.    Ordering the Defendants to enact uniform policies requiring the immediate procurement and use of COVID-19 diagnostic tests, ventilators, medicine, and related medical supplies for the VDOC facilities;

xi.    Enjoining the Defendants from engaging in any other conduct this Court finds violative of Plaintiffs' rights as alleged;

G.  Awarding them reasonable attorney's fees and costs afforded by 28 U.S.C. § 1988; and

H.  Granting them such further relief as this Court deems just and appropriate.

Respectfully submitted

_____/s_____
Elliott M. Harding, Esq.
VSB No. 90442
*Counsel for the Plaintiffs*
HARDING COUNSEL, PLLC
608 Elizabeth Ave.
Charlottesville, VA 22901
P: 434-962-8465
E: HardingCounsel@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of April, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system. I will then send the document and a notification of such filing (NEF) with a summons to the following parties via personal service or an acceptable alternative via private carrier with proof of service to be provided to the Court.

Governor Ralph S. Northam
Executive Mansion
Capitol Square
Richmond, VA 23218

Secretary Brian J. Moran
Secretary of Public Safety
1111 E Broad St # 5035,
Richmond, VA 23219

Director Harold Clarke
Virginia Department of Corrections
6900 Atmore Dr.
Richmond, VA 23225

Warden Donald Wilmouth,
Virginia Correctional Center for Women
2841 River Road
Goochland, VA 23063

Warden Rick White
Indian Creek Correctional Center
801 Sanderson Road
Chesapeake, VA 23328

Warden Thomas Meyer
State Farm Correctional Center
3500 Woods Way
State Farm, VA 23160

Warden Tikki Hicks
Haynesville Correctional Center
421 Barnfield Rd.
Haynesville, VA 22472

Warden Rodney Younce
Coffeewood Correctional Center
12352 Coffeewood Dr.
Mitchells, VA 22729

Warden Tracy Ray
Greensville Work Center
901 Corrections Way
Jarratt, VA 23870

Warden Eric Aldridge
Fluvanna Correctional Center for Women
144 Prison Ln.
Troy, VA 22974

Warden Dana Ratliffe-Walker
Dillwyn Correctional Center
1522 Prison Rd.
Dillwyn, VA 23936

Warden Tori Raiford
Caroline Correctional Unit
31285 Camp Rd.
Hanover, VA 23069

Warden Tammy Williams
Deerfield Correctional Center
21360 Deerfield Dr.
Capron, VA 23829

Warden Joseph Bateman
Patrick Henry Correctional Unit
18155 A.L. Philpott Hwy.
Ridgeway, VA 24148

Warden Phillip White
Augusta Correctional Center
1821 Estaline Valley Rd.
Craigsville, VA 24430

_____/s_____
Elliott M. Harding, Esq.
VSB No. 90442
*Counsel for the Plaintiffs*
HARDING COUNSEL, PLLC
1150 Richmond Rd., Suite B
Charlottesville, VA 22911
P: 434-962-8465
E: HardingCounsel@gmail.com